# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In re the Detention of A.H., | ) | No. 72508-4-I |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| A.H., | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: September 28, 2015 |

SPEARMAN, C.J. — A.H. appeals his 14-day involuntary commitment at Harborview Medical Center. He contends the trial court's finding that he suffered from a grave disability was not supported by sufficient evidence. We disagree and affirm.

According to a Seattle Police report dated August 29, 2014, A.H.'s mother called 911 that day and said her son was "in a state of [c]risis" and running in the street. Clerk's Papers (CP) at 7. When police arrived, they found A.H. standing shirtless outside the family home. He "did not seem to be mentally present while speaking to Seattle Police Officers, or his immediate family." CP at 8. He stared up into the sky, speaking to "Allah." Id. He went into a rage, swinging his hands wildly and telling an officer, "'I'm going to take that gun, and shoot you in the face.'" Id. Police transported A.H. to Harborview Medical Center for evaluation.

On August 30, 2014, a designated mental health professional for King County filed a petition for A.H.'s initial 72-hour detention. The petition alleged that A.H. suffered from a mental disorder and as a result presented "a likelihood of serious harm to him/herself or others or that he/she is gravely disabled." CP at 1. The petition recounted facts alleged in the police report, noting in particular that A.H. had been running in the street without regard for traffic and had not been eating or drinking.

On September 3, 2014, Harborview Medical Center filed a petition for a 14-day involuntary commitment. The petition alleged, among other things, that A.H. was "gravely disabled," that he exhibited symptoms of psychosis, and that he "reportedly decompensated over the last three weeks, resulting in refusal to eat and drink, poor sleep, aggressive behavior and unsafe behavior [.]" CP at 16.

On September 4, 2014, the superior court held a hearing on the petition for a 14-day commitment. The sole witness at the hearing was Dr. Joyce Shaffer, a licensed clinical psychologist and licensed, registered nurse. Defense counsel stipulated to Dr. Shaffer's professional qualifications, and the court qualified her as an expert.

Dr. Shaffer testified that she had evaluated A.H. and concluded that he suffered from psychosis. This condition had "a substantial adverse effect on his cognitive and emotional competence." Verbatim Report of Proceedings (VRP) at

6. It caused "severe deterioration in routine functioning, evidenced by repeated and escalating loss of cognitive and volitional control over his actions such that, outside the hospital setting, he would not receive care essential for his needs of health and safety." Id. She concluded he was gravely disabled and "in danger of serious physical harm from the failure or inability to provide for his essential needs of health and safety." Id.

In forming her opinion, Dr. Shaffer relied on several sources, including her interview with A.H. She testified that A.H. was "very disorganized" during their interview and appeared to be having visual and auditory hallucinations. VRP at 7. A.H. was "very, very thin" and told Dr. Shaffer he had "stopped eating" and was "ready to die." VRP at 6-7. He also said he attended medical school in China and was considering enrolling at Bellevue College. Dr. Shaffer concluded that A.H. was "a young man of formerly very high functioning who is, at this point, incapable of self-care because of the psychosis." VRP at 9. Dr. Shaffer described this as a "remarkable decline for an individual." VRP at 8.

Dr. Shaffer also relied on various statements in the previously mentioned police report. Although the court admitted the report, it admitted it solely as the basis of Dr. Shaffer's opinion and not as substantive evidence.

Dr. Shaffer also considered, and the court also admitted, A.H.'s hospital medical chart. The court admitted several portions of the chart solely as the basis for Dr. Shaffer's opinion and not as substantive evidence. They included

A.H.'s father's statements that A.H. went to medical school in China until early 2014, showed no signs of deterioration until approximately one month prior to his admission to Harborview, had become uncommunicative, distrustful, and uncooperative, and had decreased appetite.

The court admitted other portions of the chart as substantive evidence, including a number of chart notes. A chart note from August 29, 2014 stated that A.H. had ketones in his urine at admission and a low level of potassium. Dr. Shaffer testified that these lab results were consistent with A.H.'s statement that he had stopped eating.

Chart notes from September 2, 2014, stated that A.H. refused to talk to his parents when they visited him and that he was placed in seclusion after entering other patients' rooms and refusing to leave. Another note said "[u]pon interview, patient under blanket and refuses to speak with team. Interview ended secondary to the patient being uncooperative, re-approached 30 minutes later.... And he continued to not respond to the team." VRP at 24.

A chart note from September 3, 2014 stated that "on interview, patient continues to refuse to speak with the team [.]" VRP at 18. Another note from that day states "patient refused dinner and any foods or drinks," and "[c]ontinues to respond to internal stimuli and is positive for auditory hallucinations and visual hallucinations." VRP at 24-25. The chart indicated that his "nutrition needs" were "not met," and that he was not free from restraint or seclusion. VRP at 25.

Dr. Shaffer testified that the chart notes, A.H.'s statement that he had stopped eating, his very thin condition, and the fact that he was not cooperating with his family or staff, supported a conclusion that he was suffering from a grave disability. She stated:

> . . . this is a very, very thin man. And the fact that his labs are indicating that he's had inadequate oral intake is very concerning and place that in [the] context of this man being more responsive to auditory and visual hallucinations than he is to the environment around him and to him refusing assistance, for him to refuse to be interviewed by the caregivers that are trying to be helpful and trying to understand more of what he's experiencing. This is a man whose psychosis intervenes in such a way that he's not . . . able to manage his own care, nor can he cooperate with healthcare providers that are attempting to evaluate and treat his psychosis.

VRP at 26. Dr. Shaffer concluded that A.H. "is an individual who can't give himself adequate oral intake and he can't cooperate with those who would provide it for him." VRP at 29. When asked what "harmful consequences" she foresaw if A.H. were not committed, Dr. Shaffer said "[h]e will continue to put himself at risk either in traffic again or . . . with inadequate oral intake." Id.

On cross-examination, Dr. Shaffer conceded that chart notes indicated that A.H. had good food intake on August 30, 2014 and September 1, 2014. Other notes indicated periods of improvement in his attitude and behavior.

On redirect examination, Dr. Shaffer testified that A.H. did not meet his nutritional needs after September 1, 2014. She also noted that any improvement he experienced was likely due to compelled medication, and that he would deteriorate when he had the right to refuse medication.

The court granted the commitment petition, finding A.H. "gravely disabled" under RCW 71.05.020(17)(b). In its oral ruling, the court found that A.H. suffered from a mental disorder that was "having a substantial effect on his cognitive or volitional functions." VRP at 61. Although the court noted there was relatively little evidence of A.H.'s baseline functioning, it concluded that A.H.'s admission that he attended medical school in China established a sufficient baseline and supported findings of severe deterioration and grave disability.

The court later entered the following pertinent supplemental findings and conclusions:

> 23. After hearing from both sides, the Court began to issue its oral ruling. . . . The Court noted that at that very moment Respondent was looking up at the ceiling, holding his hands in somewhat of an open prayer method, not responding to his attorney who was talking to him, shaking his head and staring at the wall a few feet from where he was seated.

> 24. [T]he Court noted that Respondent began to chant and bend over with his head in his lap. The Court also noted that Respondent continued to chant despite his attorney's and nurse's efforts to get him to stop. . . .
>
> . . .

> 27. [T]he evidence supports a finding by a preponderance of the evidence that Respondent manifests a serious deterioration in routine functioning evidenced by loss of cognitive or volitional control over actions. This Court also found that he is not receiving care essential for his health and safety outside the hospital setting, and he is unable to make rational decisions regarding his need for treatment.
>
> . . .

> 35. In reaching the finding that he was gravely disabled, this Court considered his baseline to be that of a medical student in comparison to Dr. Shaffer's testimony regarding his current state in which he exhibited auditory and visual hallucinations, he was unresponsive, he acknowledged

he was "crazy," which he later retracted, and was "ready to die." This Court also considered that he stopped eating and was not meeting his nutritional needs. These actions are consistent with deterioration under Prong B (of Gravely Disabled Allegation), in routine functioning and a loss of cognitive and volitional control over his actions and that harmful consequences will follow if involuntary treatment is not ordered. This Court does not find any evidence that the respondent can make a rational decision about need for treatment.

36. In short, the Court finds under Prong B that the Respondent is Gravely Disabled.

## CONCLUSIONS OF LAW

. . .

4. The Petitioner proved by a preponderance of the evidence that the Respondent has a mental disorder, and as a result of that mental disorder presents as Gravely Disabled. Petitioner also proved a less restrictive alternative was not appropriate at this time.

CP 88-92 (Footnote omitted).

A.H. appeals.

## DECISION

The sole issue on appeal is whether the State presented sufficient evidence to prove that A.H. was gravely disabled.[1] Our review is limited to determining whether substantial evidence supports the court's findings of fact and, if so, whether the findings in turn support the trial court's conclusions of law and judgment. In re Detention of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986); In re Detention of Clark, 187 Wn. App. 303, 313, 348 P.3d 1231 (2015).

---

[1] Although A.H.'s commitment concluded long ago, A.H. contends, and the State does not dispute, that his appeal is not moot because an involuntary commitment order may have adverse consequences in future commitment proceedings. See RCW 71.05.245(1); In re Detention of M.K., 168 Wn. App. 621, 625-30, 279 P.3d 897 (2012).

When, as in this case, a court erroneously includes its grave disability determination in its findings of fact, we treat the finding as a conclusion of law. In re Detention of M.K., 168 Wn. App. 621, 623 n.3, 279 P.3d 897 (2012).

Under chapter 71.05 RCW, individuals may be involuntarily committed for up to 14 days if the State demonstrates by a preponderance of the evidence that, as a result of a mental disorder, they present a likelihood of serious harm or are "gravely disabled." RCW 71.05.240(3). "Gravely disabled" means a person, as a result of a mental disorder,

(a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; **or**
(b) **manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.**

RCW 71.05.020(17) (emphasis added). When, as here, the State proceeds under the definition of gravely disabled in subsection (b), it must present proof of significant loss of cognitive or volitional control and a factual basis for concluding that the individual is not receiving or would not receive, if released, the care essential for his or her health or safety. In re LaBelle, 107 Wn.2d at 208.

A.H. contends "the State failed to introduce sufficient substantive evidence that [he] manifested severe deterioration in routine functioning." Brief of Appellant at 15. He correctly points out that evidence admitted to show the basis of an expert opinion, but not as substantive evidence, cannot be used to

establish necessary facts. See Group Health Co-op. of Puget Sound, Inc. v. Dep't. of Revenue, 106 Wn.2d 391, 399-400, 722 P.2d 787 (1986); Allen v. Asbestos Corp., 138 Wn. App. 564, 579, 157 P.3d 406 (2007). A.H. contends there was insufficient substantive evidence establishing his baseline functioning; therefore, there was insufficient evidence supporting the finding that he "manifests a serious deterioration in routine functioning evidenced by loss of cognitive or volitional control over actions." CP at 89.

Although admittedly thin, the evidence was sufficient to support the court's finding by a preponderance of the evidence. Dr. Shaffer testified that 21 year old A.H. told her he was in medical school in China and had considered enrolling at Bellevue College. This substantive evidence supported an inference of recent high functioning and a finding that A.H.'s present condition showed severe deterioration in that functioning.

A.H. also contends there was insufficient substantive evidence supporting the court's finding that "he is not receiving care essential for his health and safety outside the hospital setting." CP at 89. Again, we disagree. To demonstrate that a person "is not receiving such care as is essential for his or her health or safety" as required by RCW 71.05.020(17)(b), there must be "a factual basis for concluding that the individual **is not receiving or would not receive, if released**, such care as is essential for his or her health or safety." (Emphasis

added). In re LaBelle, 107 Wn.2d at 208; In re Detention of A.S., 91 Wn. App. 146, 164, 955 P.2d 836 (1998).

Contrary to A.H.'s assertions, there was sufficient substantive evidence that his essential nutritional and mental health needs were not being met prior to his admission to Harborview, and would not likely be met if he were released. A.H.'s lab results, his statement that he had stopped eating, and his "very, very thin" appearance, all support the finding that he was not receiving care essential to his health prior to admission. His severely deteriorated mental state upon admission also supported an inference that he had not been receiving essential mental health care prior to admission.

Substantive evidence also supported the court's finding "that harmful consequences will follow if involuntary treatment is not ordered." CP at 91. Dr. Shaffer testified that A.H. would not be able to care for his nutritional needs or physical safety if released, and would not cooperate with those who would try to help him with his issues. She concluded that A.H. was "incapable of self-care because of the psychosis and more responsive to the psychosis than he is to the environment around him." VRP at 9. Dr. Shaffer's conclusions, and the court's finding of likely future harm, were supported by substantive evidence that A.H. had not met nutritional needs even while hospitalized, that he was suffering from hallucinations, impaired judgment, and lack of impulse control, and that he had

generally been unable or unwilling to communicate or cooperate with those trying to help him.

In short, the court's findings are supported by substantial evidence, and those findings support the court's conclusion that A.H. suffered from a grave disability.

Affirmed.

_Spearman, C.J._

WE CONCUR:

_Trickey, J_

_Leach, J._